Filed 8/23/21  P. v. Quintero CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOEL REYMUNDO QUINTERO, et al.,<br><br>Defendants and Appellants. | F078802<br><br>(Super. Ct. No. BF167482)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Joel Reymundo Quintero.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant Victor Manuel Quintero.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Brothers Joel and Victor Quintero were jointly tried for gang-related murder and other crimes arising out of a shooting at a gas station and convenience store one night. The evidence conclusively established the Quintero brothers possessed a single firearm and initiated a physical confrontation with two other brothers—Rolando and Eraldo Castro.[1]

After the initial confrontation, the parties separated but the Castros did not back down. Ultimately, gunfire killed Eraldo.

The Quintero brothers were acquitted of murder but convicted of voluntary manslaughter and all other charges. The jury also returned true findings on gang-related crime and personal firearm use enhancements. Together, the Quinteros raise a litany of claims to challenge the convictions, enhancements, and their respective sentences.

As explained in great detail below, we reject each contention except for a request to modify restitution. We will also strike two convictions for necessarily lesser included offenses. In all other respects, the judgment will be affirmed.

## BACKGROUND

**Charges**

The Kern County District Attorney charged Joel with the following crimes: Murder (Pen. Code,[2] § 187, subd. (a); Count 1), assault with a semiautomatic firearm (against Rolando) (§ 245, subd. (b); Count 2), assault with a firearm (against Rolando) (§ 245, subd. (a)(2); Count 3), assault with a semiautomatic firearm (against Eraldo) (§ 245, subd. (b); Count 4), assault with a firearm (against Eraldo) (§ 245, subd. (a)(2); Count 5), unlawful firearm possession (§ 29800, subd. (a)(1); Count 10), and active gang

---

[1] We refer to the parties by their first names for clarity and consistency with the record.

[2] All statutory references are to the Penal Code.

2.

participation (§ 186.22, subd. (a); Count 11).[3]  The charges included numerous enhancements for prior convictions, gang-related crimes, gang-related special circumstance murder, and personal firearm use.

The Kern County District Attorney charged Victor with the following crimes: Murder (§ 187, subd. (a); Count 1), assault with a semiautomatic firearm (against Rolando) (§ 245, subd. (b); Count 6), assault with a firearm (against Rolando) (§ 245, subd. (a)(2); Count 7), exhibiting a firearm (§ 417, subd. (a)(2); Count 8), assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); Count 9), unlawful firearm possession (§ 29800, subd. (a)(1); Count 10), and active gang participation (§ 186.22, subd. (a); Count 11).  The charges included numerous enhancements for prior convictions, gang-related crimes, gang-related special circumstance murder, and personal firearm use.

**Trial Evidence**

The incident took place at gas station with a convenience store.  It was captured on multiple surveillance cameras.  On video, the Quinteros pull in next to one of the gas pumps.  There are several other patrons at the pumps and inside the store.  Eventually, as Joel is standing inside the open driver's door, the Castros drive through the pumps, directly past Joel, and park on the store's side.  Joel watches as the Castros turn in front of him and tracks the car as it drives past.

After the Castros park, they exit their car and walk to the store's entrance. Rolando is wearing an open red and black plaid shirt.  At the store's threshold, something in the parking lot catches Rolando's attention and he turns his head toward Victor who is now approaching through the parking lot.  Rolando holds the door open and steps aside. As Victor nears the door, he retrieves a firearm from his waist area, places his hand atop it, and then replaces the firearm.  At this point he is face to face with Rolando.

---

[3] Counts 2 and 3 were dismissed during the trial.

Eraldo then confronts Victor. Victor pushes back and the two begin fighting. Victor quickly retreats and hands Joel, who by now is walking toward the storefront, the firearm. Victor resumes the fight. As Joel nears, he pulls out the firearm from his right side and points it at Eraldo's head. Joel simultaneously motions with his other hand atop the firearm in a manner consistent with chambering a round in a semiautomatic firearm.[4] The parties then separate and return to their respective vehicles.

While on the way to the pump, Joel looks back and points at the Castros multiple times. He again retrieves an object from the same area from which he had just pulled the firearm moments prior. Joel eventually reenters the driver's seat. Victor lingers near the passenger side before jogging to the storefront to retrieve a hat he lost during the confrontation.

Meanwhile, the Castros convene near the driver's door to their car. They converse while facing the Quintero car. When Victor goes to pick up his hat, the Castros visibly react to his presence.

As Victor returns to the Quintero car, Joel reverses it quickly with the door ajar before closing it. Victor reenters the passenger seat after returning with his hat.

Meanwhile, Rolando enters the driver's seat to their vehicle; Eraldo remains near the parking spot. Seconds later, Rolando drives through the parking lot and sideswipes[5] the driver's side of the Quintero car. He continues and drives past and around the pump. At the same time, Eraldo uses the car as cover, rushes from the parking spot, and throws a handful of punches at Joel through the driver's window. Within seconds he is shot from inside the Quintero vehicle and later passes away.

---

[4] A law enforcement officer testified and explained these mechanics to the jury.

[5] A law enforcement officer estimated the collision occurred at approximately "[t]wenty to 25 miles per hour."

Law enforcement quickly identified the Quinteros as the shooting party, ascertained their location, and set out to arrest them.  The Quinteros did not immediately surrender.[6]  One law enforcement officer testified overhearing Victor state, "I guess I killed him."

Although no firearm was found, the evidence indicated Joel had stolen a firearm within two months prior to the shooting.  He also posted a picture of a semiautomatic firearm on Facebook two days before the crime.

A gang expert testified the Sureño and Norteño gangs are rival gangs.  The Quinteros were Sureño gang members.  Sureños identify with the color blue while Norteños identify with the color red.  The "Sureños have a standing order to attack any [Norteños] when they come into contact with them" "but that doesn't happen every single time they come across paths."  The Sureños maintain "dominance" in the region by "attacking" rivals and committing crimes to intimidate the community.

On a prior occasion, the Quinteros had accosted a man with a red bandana.  On another, Victor had assaulted a man wearing a red shirt.[7]

**Verdict and Sentence**

The Quinteros were acquitted of murder but found guilty of voluntary manslaughter, a lesser included offense.  The jury also returned guilty verdicts for all other counts and true findings for all enhancements.[8]  Joel was sentenced to serve 54 years, four months in prison.  Victor was sentenced to serve 36 years, four months in prison.

---

[6] The parties stipulated Victor surrendered in 20 minutes.  Joel surrendered in 75 minutes.

[7] The parties stipulated Victor was "convicted of a misdemeanor … battery" for this incident.  Joel was not involved.

[8] The prior conviction enhancements were found true by the court in a bifurcated proceeding.

## DISCUSSION

Victor raises the following claims: (1) The People failed to disprove self-defense; (2) The People failed to prove Victor aided and abetted the shooting; (3) The People failed to prove Victor personally used a firearm to commit manslaughter; (4) The People failed to prove the crimes were gang-related; (5) The People failed to prove Victor committed assault with a firearm; and (6) The restitution order should reflect liability is joint and several.

Joel joined Victor's arguments regarding self-defense, gang-related crimes, and restitution. He adds two arguments. One, the prosecutor committed error by shifting the burden of proof during closing argument.[9] Two, the trial court failed to stay the sentence imposed for assault with a firearm (Count 4).

The People oppose each contention but agree the restitution order should reflect liability is joint and several. They add the convictions for Counts 5 and 7 should be stricken as necessarily lesser included crimes. After careful consideration, we agree with the People on each point.

## ANALYSIS

We will first resolve the Quinteros's joint claims. Then we will consider Victor's contentions. Third, we address Joel's arguments. Last, we turn to the lesser included conviction issue.

## I. Joint Claims

The joint claims challenge whether the evidence was sufficient to disprove self-defense, whether the evidence sufficiently proved the crimes were gang-related, whether the prosecutor misstated the law in closing argument, and whether the restitution order should reflect liability is joint and several. We conclude the evidence was sufficient on

---

[9] Victor joins this claim.

both points, the prosecutor did not err, and agree the restitution order should reflect joint and several liability.

## A. Self-Defense Sufficiently Disproven

The Quinteros argue they "full[y] and complete[ly]" ceased "hostilities" and "absolutely were within their right to self-defense in the face of the Castro brothers' unprovoked two-pronged attack." However, applying the reviewing standard leads us to conclude the jury could reasonably find beyond a reasonable doubt the Quinteros had not clearly withdrawn from the fight prior to the shooting. Alternatively, the jury could have found the responsive gunfire unreasonable.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*Ibid.*)

The prosecution bears the burden to disprove self-defense. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) An initial aggressor has no right to self-defense unless he or she "really and in good faith" withdraws from combat. (*People v. Trevino* (1988) 200 Cal.App.3d 874, 879.) If, however, "a victim of a simple assault engages in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw,

7.

and may reasonably use necessary force in self-defense."[10] (*Ibid*.; CALCRIM No. 3471.) "[A]n original aggressor may communicate withdrawal either by words or by conduct." (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 588.)

Here, the jury could have reasonably concluded the Quinteros had not clearly withdrawn. After all, they remained within striking distance of the Castros the entire time leading up to the shooting. In fact, Joel repeatedly pointed at the Castros and at various times wielded a firearm. When Victor exited the vehicle to retrieve his hat, the Castros are visibly apprehensive. These facts readily support a conclusion withdrawal was not reasonably communicated, let alone accomplished in actual good faith.

The jury could also have concluded, notwithstanding withdrawal, the gunshot was excessive. Certainly, a person sitting in a car after being sideswiped and punched would justifiably feel fear.[11] Whether immediately resorting to gunfire is a reasonable reaction is a highly fact-intensive inquiry naturally left to the jury.

The fact is in this case neither Quintero suffered serious, if any, injury. With no reason to believe the Castros were armed with a weapon,[12] the jury could reasonably believe the hasty resort to deadly force was unnecessary. This is especially so where the Castro vehicle was neither an obstacle nor an obvious threat due to the fact it had driven beyond the collision, and lack of direct insight into either Quintero's state of mind.[13] (Cf.

---

[10] Although not directly at issue on appeal, we note this sudden-deadly-counterattack caveat is inapplicable to initial aggressors that commit a felonious, rather than simple, assault. (*People v. Salazar* (2016) 63 Cal.4th 214, 249.) The trial court nonetheless instructed the jury with this exception to withdrawal.

[11] There was no direct evidence introduced to prove either Quintero's state of mind.

[12] Victor argues Eraldo used deadly force with his hands. This, again, is a factual issue the jury could have reasonably resolved against the Quinteros based on the evidence, particularly the lack of both injury and direct evidence of mental state.

[13] The surveillance video depicts Joel, after being sideswiped, driving forward a few feet before braking to a complete stop. After Joel brakes to a complete stop, Eraldo

*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 [actual belief in self-defense must be founded on evidence, albeit direct or circumstantial].)

Under either scenario, the evidence was sufficient for the jury to conclude pure self-defense disproven beyond a reasonable doubt.

### B. The Crimes Were Sufficiently Gang-Related

To attack the gang enhancement, the Quinteros claim "the record lacked substantial evidence" the shooting "was done 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " Specifically, they contend the manslaughter verdict indicates the shooting was either due to provocation or self-defense—two mental states inconsistent with the gang enhancement. We disagree.

"There are two 'prongs' to the [gang-related crime] enhancement. [Citation.] First, the prosecution is required to prove that the underlying felonies were 'committed for the benefit of, at the direction of, or in association with any criminal street gang.' [Citation.] Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 561.)

Both prongs are proven here.[14] The jury could have concluded the motive underlying the entire episode was gang-related. After all, this was not the first time the Quinteros had accosted someone over wearing the color red. As the gang expert testified, confrontations between rival gangs are expected and normal. Viewing the evidence in the light most favorable to the judgment, this case was not exceptional.[15]

---

is shot, and then Joel continues driving forward, albeit with one tire disabled from the collision.

[14] The parties' briefs focus on the second prong but we nonetheless examine the evidence for the first prong.

[15] This is true despite no evidence the Castros were actual gang rivals. The jury could conclude the Quinteros perceived them as rivals and initiated a gang-related encounter.

The surveillance videos showed Victor aggressively approach Rolando with a fireram despite having little to no interaction. These are abnormal actions the jury could readily conclude were gang-related based on the expert's testimony describing gang rivalry, the colored clothing involved, and Victor's prior history. Through this lens, the assaultive crimes preceding the shooting were associated with the Sureño gang, and because those assaults quickly culminated in a shooting, the shooting likewise was gang-associated.

The evidence was also sufficient to prove the crimes were committed with the intent to aid criminal conduct by gang members. For the initial assaultive crimes, the evidence is axiomatic. Those crimes were jointly committed by two gang members. It is not required the intent to aid criminal conduct apply to conduct *other* than the crimes actually committed. (*People v. Albillar* (2010) 51 Cal.4th 47, 66.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.)

Admittedly, whether the shooting itself was committed with the intent to aid criminal conduct by gang members is more complicated than simply tracing its origin to the preceding gang-related assault. This is so because there is scant evidence the Quinteros intended to jointly commit voluntary manslaughter. We conclude, however, the evidence was sufficient to prove it was committed with the intent to "promote, further, or assist" the preceding assaultive crimes.

Specifically, the jury could have reasonably found the shooting was intended to and necessary to permit the Quinteros to escape. Escape from the crime scene furthers or assists the preceding gang-related crimes by attempting to avoid liability or otherwise conclude the encounter. Indeed, they did flee and later resisted surrender. These actions

10.

are indicative of wrongdoing and constitute additional circumstantial evidence the shooting was not innocently committed.

Finally, we also reject the argument the specific intent to promote or assist any criminal conduct by gang members is inconsistent with self-defense. A person may concurrently entertain multiple intents. (See, e.g., *People v. Powell* (2018) 5 Cal.5th 921, 954-955.) For example, the jury here could have reasonably believed the shooting was committed both defensively *and* to escape liability for the gang-related assaults. For these reasons, we find the gang-related crime enhancement sufficiently proven for each crime.

## C. No Prosecutorial Error

The Quinteros[16] "contend[] the prosecution shifted the burden of proof with respect to self-defense during closing argument, thereby lightening the prosecution's burden of proof and depriving [them of] fair trial due process under both the United States and California Constitutions." In claiming error, they argue the prosecutor misstated the law by telling the jury the Quinteros were guilty *unless* the Castros had no right to self-defense.

In other words, if the Castros were justified in pursuing the Quinteros, then the Quinteros were guilty. We do not so narrowly view the prosecution argument.

### 1. Additional Background

Prior to closing arguments, the court instructed the jury with the law necessary to decide the case. As relevant to this issue, the jury was informed:

> "The defendant is not guilty of murder if he was justified in killing someone in self-defense or defense of another.
>
> [¶] … [¶]

---

[16] This claim was raised by Joel and joined in by Victor.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden you must find the defendant not guilty of murder."

The jury was also instructed:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in a heat of passion.

[¶] …[¶]

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Next, the instructions explained:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. If you conclude that the defendant acted in complete self-defense or defense of another, his action was lawful, and you must find him not guilty of any crime.

"The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable. The defendant acted in imperfect self-defense or imperfect self-defense of another if the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury and the defendant actually believed that immediate use of deadly force was necessary to defend against the danger, but a least one of those beliefs was unreasonable. … The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

12.

Last, the jury was told:

> "[A] person who engages in mutual combat or starts a fight has a right to self-defense, only if: One, he actually, and in good faith, tries to stop fighting; two, he indicates by word or by conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting; and, three, he gives his opponent a chance to stop fighting."

After these instructions, the prosecutor, in rebuttal argument, argued Victor was the "initial aggressor …. The question is do you see this as one continuous action or do you see this as three discrete breaks in action?" The prosecutor then emphasized the law necessary for an initial aggressor to withdraw and regain the right to self-defense. The argument continued by stating the Castros could pursue the Quinteros:

> "They can pursue an assailant until the danger of death or bodily injury has passed.
>
> "This is a gun. Now, I could understand if they're carrying around some brass knuckles and they're 25 feet off. All right.
>
> "This is a gun. A gun sends a projectile downrange, without any issue, in a second.
>
> "You are allowed to pursue an assailant.
>
> "You've seen the video. The first aggressors are Victor and Joel. Joel's actually pointed the gun at the guy's head. He is allowed to pursue until the danger of death or bodily injury or unlawful touching has passed. He doesn't have to retreat.
>
> "So the question is are you willing to provide [the Castros] the same rights of self-defense?"

At this point an objection was lodged and overruled.

The prosecutor resumed the argument,

> "Let's look at the video. They talk about how Joel walks back to the car.

13.

"Well, watch the video. What does Joel actually do?

"… Joel's pointing back. Where is he pointing back to?

"You've been out to the scene. He's pointing back to where [the Castros] are. He's pointing back. He's not just walking to his car.

[¶] … [¶]

"Again, you have to indicate, by words or conduct, that a reasonable person would understand you want to stop fighting.

"What does pointing at somebody you just pulled a gun on have to do with indicating you want to stop fighting?"

[¶] … [¶]

"You can use the video. There is a slow motion. You can play it slow. You can play it fast. You can play it however you want to. But you will not be able to get away from the fact that after Joel has pointed at them, he's got a gun in his right hand yet again.

[¶] … [¶]

"What about that indicates, by words or conduct, that a reasonable person would understand the fight is over?

"A gun being pulled out again, pointing at them. It doesn't.

[¶] … [¶]

"There's nothing in the conduct that shows a reasonable person would understand it's over.

"It's a gun. It's a gun. At this point, he's ten feet closer than he was. He's pointed it at them. They are allowed to pursue their assailants. There has been no break in the fighting.

[¶] … [¶]

14.

"[The Castros], their right to use self-defense had not expired.

"They were the initial aggressors. They did not have the right to self-defense. They can only gain it if you find that they did those required three steps, and they did not communicate in a way that a reasonable person would understand it's over."

The prosecutor then briefly discussed aiding and abetting, and that either Quintero could have been the shooter based on the evidence.

The rebuttal argument concluded,

"[The Quinteros] lost their right of self-defense. You can lose it because they started it all. There was no break whatsoever, no break where a reasonable person would think that the fight was over, and you have to go through that process, a reasonable person.

"[The Castros] can pursue their assailants.

"[The Quinteros] murdered Eraldo Castro. They started it. They never stopped it."

**2. Analysis**

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) "Regarding the scope of permissible prosecutorial argument, ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Ibid.*)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions" [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  "To establish such error, bad faith on the prosecutor's part is not required."  (*Id.* at p. 666.)

Here, were we to consider the lone statement, "[A]re you willing to provide [the Castros] the same rights of self-defense," in a vacuum, we might find error.  A "defendant is not required to establish self-defense or the defense of others to be entitled to a not guilty verdict; he need only raise a reasonable doubt.  It ultimately is the prosecution's burden to prove the absence of justification beyond a reasonable doubt." (*People v. Lloyd* (2015) 236 Cal.App.4th 49, 63 (*Lloyd*).)

Considered in proper context, however, the prosecutor's remarks in this case are consistent with arguing withdrawal was disproven beyond a reasonable doubt.  The prosecutor simply argued the fact the Castros were allowed to defend themselves meant the Quinteros had not withdrawn from the fight because the confrontation had not ceased.

To illustrate, just before the objection at issue, the prosecutor stated, "You are allowed to pursue an assailant" and the Castros were not required to retreat.  This neither conflates nor misstates the law.[17]  (*People v. Watie* (2002) 100 Cal.App.4th 866, 876-878 ["the right of a victim to defend himself … is a relevant consideration"]; *Hardin, supra,*

---

[17] In the trial court, the Quinteros vigorously argued the prosecutor misstated the law by providing a right to self-defense to the Castros.  They argued the Castros had no right to self-defense because they were not charged with a crime.  This argument has no basis in law.  As noted, a victim's right to self-defense is factually relevant.  (*People v. Hardin* (2000) 85 Cal.App.4th 625, 632-634 (*Hardin*).)

85 Cal.App.4th at pp. 632-634 [victim's right to self-defense appropriate subject of jury instructions].)

Immediately after the objection, the prosecutor resumed the point by arguing the Quinteros had not reasonably communicated withdrawal. The argument ultimately concluded, "[The Quinteros] lost their right of self-defense. You can lose it because they started it all. There was no break whatsoever …."

In total, the prosecutor's remarks are best and most reasonably understood to mean the Castros could pursue the Quinteros *because* there was no withdrawal, i.e., the Castros actions were justifiable because the Quinteros had not withdrawn from the fight, not the other way around.

On this record, we do not lightly infer the prosecutor placed a burden upon the Quinteros to prove the Castros were unreasonable. We find no error with the prosecutor's argument because it was fair comment[18] on the evidence and did not otherwise undermine fundamental fairness.[19]

---

[18] The Quinteros also chide the prosecutor for arguing they were generally unreasonable people. For example, as they fairly summarize the argument, the prosecutor stated "it was not reasonable for a person to drive around with a loaded firearm, not reasonable to retrieve a firearm and walk towards a person in anger, not reasonable to pull out a gun in front of a store, and not reasonable to hit someone who extends their hand for a handshake." We have reason to doubt the legal relevancy of these points. A gang member illegally possessing a firearm has a right to defend himself.

Nonetheless, there was no specific objection to this line of argument. The argument is thus forfeited. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal."].)

Even were we to consider the matter, we would find no error. The instructions clearly informed the jury which facts involved a reasonableness element. The prosecutor's argument the Quinteros were unreasonable in general was irrelevant and not inflammatory. We do not believe the jury was prejudiced by these comments.

[19] The jury was also admonished numerous times the prosecutor bore the burden to prove facts beyond a reasonable doubt. (E.g., CALCRIM Nos. 220, 224, 505, 570,

**D. The Restitution Order Should Reflect Liability Is Joint and Several**

Each Quintero was separately ordered to pay full restitution. They now contend the orders should clearly state restitution is joint and several. The People agree the orders are ambiguous, and so do we.

"The trial court is required to order restitution to crime victims, and the court has authority to make the obligation of multiple codefendants joint and several." (*People v. Neely* (2009) 176 Cal.App.4th 787, 800.) "A restitution order should compensate a victim for actual losses. [Citation.] But it should not overcompensate a victim with a windfall award." (*People v. Erickson* (2018) 30 Cal.App.5th 243, 246.)

Should each Quintero satisfy the full restitution obligation, a windfall would occur under the court's order. To avoid this possibility, the trial court should issue amended orders and abstracts of judgment indicating the restitution obligation is joint and several.

**II. Victor's Claims**

Victor raises three insufficient evidence claims: (1) The evidence did not prove he aided and abetted voluntary manslaughter; (2) The evidence did not prove he personally used a firearm in committing manslaughter; and (3) He did not commit assault with a firearm. We find no merit in these contentions.

**A. The Evidence Sufficiently Proved Voluntary Manslaughter**

Although Victor specifically argues the evidence did not prove he aided and abetted the shooting, we need not resolve that claim because the evidence sufficiently proved he directly committed voluntary manslaughter. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127 ["if there are two possible grounds for the jury's verdict, one unreasonable and the other reasonable, we will assume, absent a contrary indication in

---

571, & 3470.) Although the Quinteros argue the error here was exacerbated by the court overruling the objection (see, e.g., *Lloyd, supra,* 236 Cal.App.4th at p. 63 ["court's action in overruling the defendant's objection aggravated the situation"]), it was properly overruled because there was no error.

the record, that the jury based its verdict on the reasonable ground"].) Put simply, Victor admitted to killing Eraldo.[20]

We reach this conclusion despite the fact Joel is last seen with the firearm outside the vehicle. The jury could reasonably infer he regained possession inside the vehicle. The firearm was clearly transferable between the Quinteros. The evidence strongly indicated Joel initially stole the firearm used in the shooting. Then, Victor first possessed it at the gas station. After committing a crime with it, he passed it to Joel, who also committed a crime with it. The Quinteros displayed no hesitation in either committing crimes with the firearm or passing it around. Victor's admission to shooting is sufficient to prove he again possessed the firearm, pulled the trigger, and committed manslaughter.

Our holding is not inconsistent with the law. The jury was instructed to consider the evidence and charges separately for each Quintero.[21] Neither the state nor federal constitution forbids holding each Quintero separately liable as the lone shooter.[22] (*People v. Palmer* (2001) 24 Cal.4th 856, 858 ["If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently

---

[20] Although Victor rigorously asserts his statement, "I guess I killed him," is susceptible to varying interpretation, we must view it in the light most favorable to the verdict. (*Lindberg, supra,* 45 Cal.4th at p. 27.)

[21] CALCRIM Nos. 203 and 3515.

[22] Notably, "the People's use of irreconcilable theories of guilt or culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for—and, where prejudicial, actually achieves—a false conviction or increased punishment on a false factual basis for one of the accuseds." (*In re Sakarias* (2005) 35 Cal.4th 140, 159-160.) Conversely, such usage is "not … improper as long as it [is] based on the record and made in good faith." (*People v. Farmer* (1989) 47 Cal.3d 888, 923.)

The prosecutor's argument in this case lands in the latter category. Based on the evidence, the prosecutor argued either Quintero was the shooter. We discern no bad faith in the argument.

19.

inconsistent verdict as to another defendant"].)  For these reasons, we uphold the voluntary manslaughter conviction.

### B.  The Evidence Sufficiently Proved Personal Firearm Use

For the precise reasons the evidence sufficiently proved Victor committed voluntary manslaughter, it necessarily also proved he personally used a firearm to kill Eraldo.[23]

### C.  The Evidence Sufficiently Proved Assault With Firearm

Victor argues his "momentary display of the handgun qualified as brandishing, not assault with a firearm."  More specifically, he claims  the "act of lifting the handgun from his pocket and replacing it within five seconds without ever elevating the barrel horizontally or pointing it at Rolando does not qualify as [an] 'act with a firearm that by its nature would directly and probably result in the application of force to a person.' "  Based on the record in this case, we disagree.

" 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' "  (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263.)  Assault with a firearm "can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime."  (*Ibid*.)

" '[T]he mental state required for assault … is an act done toward the commission of a battery ….' "  (*People v. Chance* (2008) 44 Cal.4th 1164, 1175 (*Chance*).)  "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault.  There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay."  (*Id.* at p. 1172.)

---

[23] On appeal, the People claim Victor's earlier firearm use at the storefront constitutes using "a firearm in the commission" of manslaughter.  (§ 12022.5, subd. (a).)  We need not address the precise point because we find the evidence sufficient to prove direct commission—by firearm—of voluntary manslaughter.

Conduct "sufficient to establish the actus reus required for assault" includes "positioning [oneself] to strike on the present occasion with a loaded weapon." (*Chance, supra,* 44 Cal.4th at p. 1176.) Victor's act in drawing a loaded firearm while face to face with Rolando is sufficient to prove the actus reus for assault.

The jury in this case was entitled to infer Victor's act in placing his hand atop the firearm loaded, or at least attempted to load, a round into the chamber. This action sheds significant light on his mental state as he stood face to face with Rolando. Victor then struck Rolando, albeit without the firearm, seconds later. The jury could reasonably conclude Victor withdrew the firearm to shoot or strike Rolando with it but changed his mind. This sufficiently proves the mental state necessary for assault, i. e., " 'an act done toward the commission of a battery ….' " (*Chance, supra,* 44 Cal.4th at p. 1175.) Combining the act with his mental state, the evidence sufficiently proved assault with a firearm, even though he did not discharge, point, or swing the firearm at Rolando. (See *id.* at pp. 1175-1176.)

## III.  Joel's Claim

Joel "contends the trial court erred in imposing a consecutive sentence on count 4." We disagree.

### A.  Additional Background

The court imposed a consecutive sentence on Count 4, assault with a firearm, notwithstanding the fact Eraldo—the victim of the assault—was killed moments later. The court stated, "As to Count 4, the Court is going to find that while it did involve the same victim as the decedent in this case, it did require and involve a separate objective, and even though, in this Court's view, it was during the same course of conduct, it was a separate act of violence against the same victim that will justify a consecutive term at one-third the mid term for purposes of Count 4."

**B. Analysis**

"Section 654 provides in relevant part: 'An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.' [Citation.] Accordingly, '[s]ection 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct.' [Citation.] ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses not for more than one." ' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717 (*Lopez*).)

" '[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.' [Citation.] Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " (*Lopez, supra,* 198 Cal.App.4th at pp. 717-718.) "If the court makes no express findings on the issue … a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence." (*Id.* at p. 717.)

The court here found the conduct divisible in time. After committing the assault near the storefront, Joel had a clear opportunity to reevaluate his actions and leave. But he did not. He instead remained, while in control of the vehicle, until someone was killed. There is no doubt the initial assault and later shooting were distinctly harmful as each could escalate, and one actually did, into a shootout. We see no error in the court's conclusion to impose a consecutive sentence on Count 4.

22.

## IV. Convictions For Necessarily Lesser Included Offenses

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226.) "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*Id.* at p. 1227.)

"A semiautomatic firearm assault cannot be committed without also committing a firearm assault. Therefore, firearm assault is a lesser included offense of a semiautomatic firearm assault." (*People v. Martinez* (2012) 208 Cal.App.4th 197, 199.)

In this case, each Quintero was convicted of semiautomatic firearm assault and firearm assault as alternative charges.[24] After the verdict, the court should have stricken the lesser included firearm assault convictions (Counts 5 and 7). We will order them stricken.

---

[24] The charges were pled in the alternative presumably because, absent finding the actual firearm at issue, there was no ironclad proof the weapon was semiautomatic.

**DISPOSITION**

The convictions on Counts 5 and 7 are stricken. The trial court is directed to issue amended orders and abstracts of judgment reflecting both the stricken convictions and that restitution is a joint and several liability.

SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


MEEHAN, J.

24.